UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | |
|---|---|
| STEVEN CLARKE, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>MICHAEL BLAIS, *et al.*, )<br>)<br>Defendants. ) | Civil No. 05-177-P-H |

**RECOMMENDED DECISION**

Steven Clarke, pro se, filed a civil action against Michael Blais and other personnel of the Knox County Jail and Knox County Sheriff's Department for the alleged use of excessive force against him, as well as a claim against physician's assistant Jonathan Coggeshall for denial of medical treatment and against Todd Butler and Richard Robbins for refusing to gainsay Coggeshall with regard to Coggeshall's medical treatment decisions. All of these claims are alleged to concern violations of Clarke's rights under the Eighth Amendment and Fourteenth Amendment. Now pending are the defendants' motions for summary judgment against the federal claims and related state law tort claims. I recommend that the Court grant the motions.

**Summary Judgment Facts**

The following statement of facts is drawn from the parties' Local Rule 56 statements of material fact in accordance with this District's summary judgment practice. See Doe v. Solvay Pharms., Inc., 350 F. Supp. 2d 257, 259-60 (D. Me. 2004) (outlining the procedure); Toomey v. Unum Life Ins. Co., 324 F. Supp. 2d 220, 221 n.1 (D. Me. 2004) (explaining "the spirit and purpose" of Local Rule 56). Pursuant to Rule 56 of the Federal Rules of Civil Procedure, all evidentiary disputes appropriately generated by the parties' statements have been resolved, for

purposes of summary judgment only, in favor of the non-movant. Merch. Ins. Co. v. U.S. Fid. & Guar. Co., 143 F.3d 5, 7 (1st Cir. 1998).

A.    **The March 3, 2003, Use of Force**

On or about June 18, 2002, Steven Clarke entered into the custody of the Knox County Jail. Clarke was transferred to the Penobscot County Jail on June 20, 2002, where he remained until posting bail on August 28, 2002. (Defs.' Statement of Material Facts re. Excessive Force Claim ¶ 1, Docket No. 67.) Clarke returned to the custody of the Knox County Jail on January 28, 2003, following arrest and charges for assault, terrorizing, criminal trespass and for violating the conditions of his release. (Id. ¶ 2.) Clarke escaped from custody on February 26, 2003, while he was being held at the holding area of the Knox County Superior Court and he remained at large for approximately two days. (Id. ¶ 3.)

On March 3, 2003, Clarke was taken to court and returned at approximately 12:03 p.m. Shortly thereafter Knox County Jail staff strip searched Clarke and escorted him to the booking desk where he requested to speak with Chief Deputy Todd Butler. (Id. ¶ 7.) Sergeant Blais informed Clarke that he, Blais, had spoken to Chief Deputy Butler and given Butler a message from Clarke, and that Butler had stated that he wanted Clarke to remain assigned to the detox cell at the jail. (Id. ¶ 8.) Clarke repeatedly asked Blais for the details of what was said by Blais and by Butler and Blais instructed Officers Mark Smith and Rebecca Gracie to return Clarke to his cell. (Id. ¶ 9.) When Smith and Gracie took hold of Clarke's arms, Clarke resisted and refused to move. Clarke shook free of the two officers and lunged towards the booking desk where he slammed his hands down on the desk. (Id. ¶ 10.) Blais stood up and began moving around the desk to assist Smith and Gracie, whereupon Clarke "lunged toward where Blais was standing." (Id. ¶ 11.) Blais grabbed Clarke and, together, Blais, Smith and Gracie "escorted" Clarke toward

his cell. (Id. ¶ 12.) According to Blais, Clarke was noncompliant so someone made a call for assistance with the task of "subduing Clarke and getting him into his cell." (Id. ¶ 13.) Three more officers, Michael Mank, Matthew Dearborn and Michael Stone responded to the call and assisted with this effort. (Id. ¶ 14.) As the group approached the intended cell, Clarke managed to shut the door while he was still outside the cell, thereby blocking the path into the cell. (Id. ¶ 15.) Blais pushed Clarke to the side of the door, and was then able to open the door. (Id. ¶ 16.) As Blais opened the cell door the other officers released Clarke and Clarke charged at Blais. (Id. ¶ 17.) Mank, Dearborn, Stone, Smith and Gracie interceded and restrained Clarke on the floor, where Blais was able to handcuff him. (Id. ¶ 18.) The officers then placed Clarke in the cell with his hands cuffed. (Id. ¶ 19.)

At 12:45 p.m., Clarke pounded on his cell window and stated that he had broken bones. (Id. ¶ 20.) At 12:50 p.m., Blais removed Clarke's handcuffs and put Clarke in "facility handcuffs" and leg restraints. (Id. ¶ 21.) At approximately 1:26 p.m., Clarke yelled that his right shoulder was broken. (Id. ¶ 22.) At 1:36 p.m., Nurse Johns arrived at Clarke's cell to examine him. While this examination transpired, Blais observed that Clarke had managed to move his cuffed hands from behind his back to the front of his body. (Id. ¶ 23.) Blais removed the handcuffs and reapplied them so that Clarke's hands were again restrained behind his back. (Id. ¶ 24.) Clarke asked Nurse Johns for something for pain in his shoulder and neck, but refused the Tylenol and Ibuprofen offered by Johns on the ground that the medication would damage his liver. (Id. ¶ 28.) After Nurse Johns left the holding cell area, Clarke began banging his head against his cell door. Jail staff moved Clarke to another cell for closer observation. (Id. ¶ 25.) They removed all restraints from Clarke at 2:54 p.m., roughly two and one-half to three hours after his return from court. (Id. ¶ 26.) Nurse Johns returned to see Clarke the following day, at

which time Clarke informed Johns that his neck and shoulder "felt tight." (Id. ¶ 29.) Physician's Assistant Jonathan Coggeshall also visited Clarke and prescribed Flexeril in response to Clarke's complaint of shoulder and neck soreness. (Id. ¶ 30.) Clarke took the Flexeril from March 4 to March 8, 2003. (Id. ¶ 31.)

Steven Clarke has failed to file a proper opposing statement of material facts. What he has done is incorporate a factual narrative into his memorandum in opposition to the motion for summary judgment on the excessive force claim. (See Docket No. 82.) Clarke's narrative characterizes the physical confrontation of March 3, 2003, somewhat differently than the defendants have. (Id. at 3-4.[1]) However, the narrative is unsworn and Clarke fails to support the material qualifications and additional facts of his narrative with citations to anything in the record that has evidentiary value. As a consequence, I have taken the defendant's material factual statements, which are supported by affidavits, as uncontested. See D. Me. Loc. Rule 56(f); Sirois v. Prison Health Servs., 233 F. Supp. 2d 52, 54-55 (D. Me. 2002) ("By not responding in comport with the rules [the plaintiff] has failed to put a single fact offered by the defendants into dispute [or] put before the court adequately supported additional material facts."); Parkinson v. Goord, 116 F. Supp. 2d 390, 393 (W.D.N.Y. 2000) ("Proceeding pro se does not otherwise relieve a litigant of the usual requirements of summary judgment, and a pro se party's bald assertions, unsupported by evidence, are insufficient to overcome a motion for summary judgment."). To be sure, there is an affidavit attached to Clarke's amended complaint (Docket No. 20, Elec. Attach. 3) that would add color to this factual statement with regard to the manner and degree to which the officers applied force to Clarke on March 3, 2003. However, I have not incorporated those averments because they were not presented in accordance with Local

---

[1] Clarke mistakenly numbers his pages on every other page, so that page three is labeled page 2 and page 5 is labeled page 3, etc. I cite the actual page numbers rather than following Clarke's numbering system.

Rule 56, which mandates that the parties generate a summary judgment factual record by means of statements of fact that are supported by specific citations to record material. The defendants have complied with Local Rule 56 and Clarke's noncompliance has set up a situation in which it is no longer possible for the defendants to reply to Clarke in a manner that would comport with the Rule. Indeed, the officers subject to the excessive force claim have not even filed a reply. I conclude that the only fair means of resolving this impasse is to apply Local Rule 56. It is, after all, a mandatory rule. As a consequence, the summary judgment record for the excessive force claim is drawn exclusively from the defendants' statement of material facts, to the extent the statements are material and are supported by citations to materials of evidentiary quality.

**B.     The Denial of Requested Treatment for Hepatitis C**

Defendant Jonathan Coggeshall is a Maine licensed physician's assistant. (Def. Coggeshall's Statement of Material Facts ¶ 1, Docket No. 65.) During the time Steven Clarke was at the Knox County Jail in 2003, Coggeshall was under contract to provide primary care medical services at the jail. (Id. ¶ 3.) His licensure included diagnosis and treatment of chronic conditions, including Hepatitis C. (Id. ¶ 4.) Coggeshall's training and experience includes treatment of patients with Hepatitis C and patients with hypoglycemia. (Id. ¶¶ 5, 7.) Coggeshall has seen many patients with Hepatitis C while they were in custody in county jails. (Id. ¶ 6.)

Steven Clarke has Hepatitis C and was diagnosed with it sometime prior to his admission to Knox County Jail. (Id. ¶ 16.) Coggeshall saw Clarke in relation to Clarke's Hepatitis C while Clarke was a pretrial detainee at the Knox County Jail. (Id. ¶¶ 9, 13.) Clarke was not taking any medications when he entered the jail. (Id. ¶ 15.) However, Clarke demanded Hepatitis C antiviral treatment while at the jail. (Id. ¶ 21.)

Hepatitis C is a chronic viral disease. (Id. ¶ 17.) In many patients, Hepatitis C may progress slowly, if at all, over extended periods of time. (Id. ¶ 18.) The treatment for Hepatitis C, when indicated, is antiviral therapy. (Id. ¶ 19.) Antiviral therapy is not indicated for all persons diagnosed with Hepatitis C; many persons with Hepatitis C in jail do not qualify for treatment. (Id. ¶ 20.) According to Coggeshall, antiviral therapy depends on an adequate time period for treatment. (Id. ¶ 25.) If interrupted, antiviral therapy risks failure and the patient is needlessly put at risk of severe side effects resulting from the drugs used to treat the disease. (Id. ¶ 26.) One of many adverse side effects of antiviral therapy is the risk of serious effects on mood and mental health, including depression and suicidal ideation. (Id. ¶ 29.)

In Coggeshall's view, Clarke was a poor candidate to start antiviral treatment because, as a pretrial detainee, he could be acquitted, convicted, transferred to another jail, transferred to a mental hospital for evaluation, or released at any time. (Id. ¶ 23.) Coggeshall asserts that pretrial and pre-sentence detainees are ordinarily not started on antiviral treatment due to the potential for interrupted therapy. (Id. ¶¶ 27-28.) He observes that Clarke arrived at the Knox County Jail on January 28, 2003, and was transferred to the Cumberland County Jail on September 23, 2003. (Id. ¶ 9.) In the interim, Clarke escaped from the custody of the Knox County Sheriff on February 26, but was apprehended on February 28, 2003. (Id. ¶ 10.) Thereafter, Clarke returned to Knox County Jail on January 12, 2004, and remained through December 16, 2004, when he left the Jail to serve a sentence at the Maine State Prison. (Id. ¶¶ 11-12.)

Coggeshall evaluated Clarke several times during his detention to determine whether Hepatitis C treatment was suitable for him. (Id. ¶ 22.) He notes that Clarke complained of psychiatric conditions and was seen several times by Mid-Coast Mental Health Center during his

6

detention, including for "crisis assessments."[2] (Id. ¶¶ 30-31.) Coggeshall monitored Clarke's liver function on March 9, 2003, on October 13, 2003, on March 5, 2004, and on August 27, 2004, in order to evaluate him for antiviral treatment. (Id. ¶ 35.) Such monitoring is a recognized means of tracking the severity of Hepatitis C in patients diagnosed with the disease. (Id. ¶ 34.) According to Coggeshall, Clarke's serum alanine aminotransferase ("ALT") levels were slightly elevated, but other measures of his liver function were normal and his ALT levels were generally stable. (Id. ¶ 36.) He reports that Clarke's ALT levels were never more than twice the normal level and that ALT levels over twice the normal level are considered more significant in determining whether to commence Hepatitis C treatment. (Id. ¶ 37.) Coggeshall asserts that, in his professional judgment, it was not appropriate to start Clarke on the requested antiviral treatment because he was a pretrial detainee who might be relocated during treatment, because his ALT levels were not high enough to justify the treatment, and because of his "history," which I presume refers to his psychiatric history. (Id. ¶¶ 39-41.) According to Coggeshall, two other medical professionals with whom he consulted agreed with his assessment. (Id. ¶¶ 42-43.)

**C.    Other Health Issues**

Clarke was diagnosed with hypoglycemia following an April 4, 2003, episode in which he became combative while visiting the courthouse, lost consciousness and reported lacking any memory of the episode. He was transported for emergency medical treatment and the emergency physician diagnosed hypoglycemia, or a low glucose level in the blood, as well as ketones in the blood, indicating the possibility of starvation ketosis. It appears from the medical records that Clarke was refusing some meals. (See Docket No. 80, Ex. 3; Docket No. 82, Ex. 3.) Coggeshall

---

[2]    Clarke himself cites medical records from April 2003 that reflect his depressed and anxious mood. (Docket No. 82, Ex. 3.)

prescribed a high fiber, low fat diet, told Clarke to eat regularly and Clarke's blood sugar levels were monitored for a time. (Docket No. 80, Exs. 6 & 7; Def. Coggeshall's Statement of Material Facts ¶¶ 50-54.) These steps have proven adequate to control Clarke's glucose level. In Coggeshall's words, they "showed the expected positive result." (Id. ¶ 55.)

On April 25, 2003, in the context of responding to one of Clarke's grievances regarding his medical care, Chief Deputy Todd Butler advised Clarke that the administrative staff would not contradict the decisions made by Coggeshall or other medical providers concerning Clarke's medical treatment. (Defs.' Statement of Material Facts re. Excessive Force Claim ¶ 44.)

On July 22, 2004, Coggeshall saw Clarke in regard to Clarke's complaint of a skin rash. (Docket No. 80, Ex. 5.) Clarke complains that Coggeshall should have considered whether the skin rash was pruritus triggered by Hepatitis. (Pl.'s Opp'n Mem. at 3-4, Docket No. 82.)

On July 22, 2004, Clarke visited Coggeshall during "med call" and demanded psychiatric medication, which Coggeshall refused. Clarke became agitated and began yelling at Coggeshall, saying things like, "give me the meds or I will fucking kill you!" (Docket No. 82, Ex. 8.) Mid-Coast Mental Health Center evaluated Clarke on July 22, 2004. Some manner of clinician from the health center (not a psychiatrist) recommended that Clarke be put on Seroquel, an anti-psychotic medication. Coggeshall disagreed with this recommendation, believing that the medication Clarke was currently receiving, Effexor, was appropriate for Clarke's condition. (Id.; Def. Coggeshall's Statement of Material Facts ¶¶ 59-62.) The health center saw Clarke again, over the next two days, evidently because Clarke was yelling and carrying on about not receiving Seroquel as recommended by the health center clinician. This time the clinician reported "no safety issues" and no "assaultive ideation." (Id. ¶ 63.) The Seroquel recommendation was not

8

repeated. The summary judgment record does not contain any evidence of any subsequent violent outbursts by Clarke.[3]

## Discussion

"The role of summary judgment is to look behind the facade of the pleadings and assay the parties' proof in order to determine whether a trial is required." Plumley v. S. Container, Inc., 303 F.3d 364, 368 (1st Cir. 2002). A party moving for summary judgment is entitled to judgment in its favor only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is material if its resolution would "affect the outcome of the suit under the governing law," and the dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In reviewing the record for a genuine issue of material fact, the Court must view the summary judgment facts in the light most favorable to the nonmoving party and credit all favorable inferences that might reasonably be drawn from the facts without resort to speculation. Merchants Ins. Co. v. United States Fid. & Guar. Co., 143 F.3d 5, 7 (1st Cir. 1998). If such facts and inferences could support a favorable verdict for the nonmoving party, then there is a trial-worthy controversy and summary judgment must be denied. ATC Realty, LLC v. Town of Kingston, 303 F.3d 91, 94 (1st Cir. 2002).

---

[3] After these motions were referred to me Clarke filed two documents entitled Amended Response to Motion for Summary Judgment and Amended Response to Statement of Fact, both pertaining to the Coggeshall motion for summary judgment. (Docket Nos. 91 & 92). Nothing in Local Rule 56 allows such a pleading, especially when the pleadings were apparently filed in direct response to Coggeshall's reply memorandum (Docket No. 89), the final pleading on the motion allowed without further leave of court. However, even if these pleadings were somehow considered by the court, they do not move Clarke's case forward.

Clarke complains that the defendants acted under color of state law to violate his constitutional rights as a prison inmate to be shielded from excessive force and to receive necessary medical care. He brings these federal claims pursuant to 42 U.S.C. § 1983. (Am. Compl. ¶ 1.) Clarke also alleges that the defendants committed the state law torts of assault, medical malpractice, and negligence. (Id. ¶ 2.) I address the federal claims first.

**A.    The § 1983 Claims**

Title 42 U.S.C. § 1983 confers upon every United States citizen a right to redress against any person who, acting under color of state law, causes a deprivation of his or her "rights, privileges, or immunities secured by the Constitution and laws" of the United States. To maintain a claim under section 1983, a plaintiff must establish two things: (1) that the conduct complained of has been committed under color of state law, and (2) that this conduct worked a denial of rights secured by the Constitution or laws of the United States." Barreto-Rivera v. Medina-Vargas, 168 F.3d 42, 45 (1st Cir. 1999) (citing Martinez v. Colon, 54 F.3d 980, 984 (1st Cir. 1995)). The defendants do not challenge that the first matter has been established on the record. As for the second, "[section] 1983 'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" Graham v. Connor, 490 U.S. 386, 393-94 (1989) (quoting Baker v. McCollan, 443 U.S. 137, 144 n.3 (1979)). "As in any action under § 1983, the first step is to identify the exact contours of the underlying right said to have been violated." County of Sacramento v. Lewis, 523 U.S. 833, 842 n.5 (1998).

10

1.      **Excessive force**

The defendants who are subject to the excessive force claim (Sergeant Blais and corrections officers Todd Butler, Kathy Carver, Daniel Davey, Rebecca Gracie, Michael Mank, Richard Robbins and Michael Stone)[4] request summary judgment on the ground that the record lacks any evidence that "unnecessary and wanton pain and suffering" was ever inflicted upon Clarke, only de minimus pain and discomfort without physical injury. (Def.'s Mot. Summ. J. on Excessive Force Claim at 7-9 & n.2, Docket No. 66.) Should the Court disagree, they argue in the alternative that they are all entitled to qualified immunity because reasonable officers in their positions would not have regarded their conduct as sufficient to violate Clarke's constitutional rights, given the totality of the circumstances. (Id. at 10-11.) Finally, the defendants assert that there can be no municipal liability for Knox County because it has not been demonstrated that a municipal policy or custom was the moving force behind any of the alleged deprivations. (Id. at 12-14.)

There are two possible standards that might apply to Clarke's excessive force claim.[5] The first standard, relied upon by the defendants in their memorandum of law, has been coined the "malicious and sadistic" standard, based on language found in Hudson v. McMillian, 503 U.S. 1, 9 (1992), *viz*: "When prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated." This is an Eighth Amendment standard related to the Cruel and Unusual Punishment Clause and is applied to claims brought against prison authorities that arise from the use of force in the prison context. The basic standard

---

[4]     Note that the summary judgment facts lack any mention of what, if anything, Kathy Carver, Daniel Davey and Richard Robbins ever did to cause harm to Clarke. Note, too, that corrections officers Matthew Dearborn and Mark Smith, who do factor into the summary judgment facts, were not named as defendants in this action.

[5]     The "excessive force" rubric is more commonly seen in the Fourth Amendment context. However, the Fourth Amendment is generally considered to have no application to excessive force claims brought by a member of the prison population. See, e.g., Phelps v. Coy, 286 F.3d 295, 300 (6th Cir. 2002).

11

requires the plaintiff to prove that the use of force resulted in an "unnecessary and wanton infliction of pain." Id. at 5; Whitley v. Albers, 475 U.S. 312, 319 (1986) (quoting Estelle v. Gamble, 429 U.S. 97, 103 (1976)[6]). This standard is refined according to the category of case at hand. "[W]hen authorities use force to put down a prison disturbance," Hudson, 503 U.S. at 6, the standard becomes "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." Whitley, 475 U.S. at 320-21. The second standard is the appreciably lower "objective reasonableness standard" familiar to Fourth Amendment jurisprudence, which has been applied to excessive force claims brought by pretrial detainees and persons committed to state custody in civil proceedings. See, e.g., Davis v. Rennie, 264 F.3d 86, 101-102 (1st Cir. 2001) (involving a claim by an involuntarily committed mental patient); Johnson-El v. Schoemehl, 878 F.2d 1043, 1048 (8th Cir.), cert. denied, 493 U.S. 824, 871 (1989) (involving a claim by a pretrial detainee and holding that "practices" rationally related to prison security are still unconstitutional if they are "excessive in light of their purpose"); Rankin v. Klevenhagen, 5 F.3d 103, 105-106 (5th Cir. 1993) (recognizing the standard is lower for pretrial detainees than for convicted inmates or pretrial detainees whose custody also flows from parole violations). The rationale for applying the objective reasonableness standard to claims by pretrial detainees is that pretrial detainees have not been incarcerated for purposes of punishment and, therefore, ought not be subject to the more exacting Eighth Amendment standard. Roberts v. Troy, 773 F.2d 720, 723 (6th Cir. 1985); see also Graham v. Connor, 490 U.S. 386, 395 n.10 (1989) ("[T]he Due Process Clause protects a pretrial detainee from the use of excessive force that amounts to punishment."); Bell v. Wolfish, 441 U.S. 520, 535-37 (1979) ("[A] detainee may not be punished prior to an

---

[6] Actually, the "unnecessary and wanton" phrase appears to originate in Gregg v. Georgia, 428 U.S. 153, 173 (1976).

12

adjudication of guilt in accordance with due process of law. . . . [T]he Government concededly may detain him to ensure his presence at trial and may subject him to the restrictions and conditions of the detention facility so long as those conditions and restrictions do not amount to punishment."). In Block v. Rutherford, 468 U.S. 576, 584 (1984), the Supreme Court reiterated its holding in Wolfish that proof of intent to punish would support a pretrial detainee's due process claim and that, '[a]bsent proof of intent to punish, . . . this determination 'generally will turn on whether an alternative purpose to which [the restriction] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned [to it].'" Id. at 584 (quoting Wolfish, 441 U.S. at 538). In effect, when a state actor applies force to the person of a pretrial detainee, the Due Process Clause requires that the force applied be "objectively reasonable" in light of the circumstances.

Assuming the objective reasonableness standard[7] of the Supreme Court precedent extends to claims involving the use of force to control a perceived threat or an outburst by a pretrial detainee, at least where the disturbance is limited to conduct on the part of the pretrial detainee acting alone and not part of a general prison riot, I conclude Clarke has not presented sufficient evidence to survive summary judgment. Clarke's summary judgment presentation fails to raise a genuine issue of material fact capable of supporting a finding that the degree of force applied to him on March 3, 2003, was excessive in relation to the need to "escort" Clarke to his cell. The defendants have informed the Court only that force was used to return Clarke to his cell, that

---

[7] This approach has not been universally adopted by the circuit courts of appeals, at least three of which have imposed the malicious and sadistic standard to claims of excessive force brought by pretrial detainees where the force was used to suppress a "disturbance." Fuentes v. Wagner, 206 F.3d 335, 347-48 (3d Cir. 2000), cert. denied, 531 U.S. 821 (holding that when force is used to quell a "prison disturbance" it is impractical to differentiate between pretrial detainees and convicted inmates or to expect prison personnel to draw such distinctions in responding to a prison disturbance); Valencia v. Wiggins, 981 F.2d 1440, 1446 (5th Cir. 1993) ("[T]here is no reason to distinguish between pretrial detainees and convicted inmates in reviewing challenged security practices because there is no basis to conclude that pretrial detainees pose any lesser security risk than convicted inmates."); Simms v. Bruce, 104 Fed. Appx. 853, 857 (4th Cir. 2004) (unpublished per curiam op.) (same).

13

Clarke resisted the effort, and that Clarke experienced pain and discomfort for a few days. Without any evidence in the summary judgment record of the nature and degree of force applied and the extent of any resistance offered by Clarke, Clarke fails to generate a trial-worthy controversy on the issues of objective reasonableness and the defendants are therefore entitled to judgment as a matter of law. I realize Clarke has attempted to interject such evidence through his unsworn memoranda and other pleadings, but even if the court were to somehow credit those pleadings, the undisputed end result of the fracas strongly supports the conclusion that the force applied was objectively reasonable.

### 2.     Denial of medical care

Defendant Coggeshall requests that summary judgment enter against Clarke's medical needs claim because the record cannot support a finding of deliberate indifference to a serious medical need. (Coggeshall's Mot. Summ. J. at 7-8, Docket No. 64.) Some courts treat denial of medical care claims the same under either the Eighth Amendment or the Fourteenth Amendment regardless of whether the claimant is a pretrial detainee or an inmate serving a sentence of incarceration. See, e.g., Chapman v. Keltner, 24 F.3d 842, 845 (7th Cir. 2001); but see Revere v. Mass. Gen. Hosp., 463 U.S. 239, 244 (1983) (holding that "the due process rights of a [pretrial detainee in need of medical care] are *at least* as great as the Eighth Amendment protections available to a convicted prisoner") (emphasis added); Gaudreault v. Salem, 923 F.2d 203, 208 (1st Cir. 1990) ("The boundaries of this duty have not been plotted exactly; however, it is clear that they extend at least as far as the protection that the Eighth Amendment gives to a convicted prisoner."). The Eighth Amendment standard for medical needs cases is the "deliberate indifference" standard. Wilson v. Seiter, 501 U.S. 294, 303 (1991). In order for a medical needs claim to be viable under the Eighth Amendment, there must be "acts or omissions sufficiently

14

harmful to evidence deliberate indifference to serious medical needs." Estelle, 429 U.S. at 106. This standard "has both an objective component (was there a sufficiently serious deprivation?) and a subjective component (was the deprivation brought about in wanton disregard of the inmate's rights?)." DesRosiers v. Moran, 949 F.2d 15, 18 (1st Cir. 1991). The subjective component requires "actual knowledge of impending harm, easily preventable." Id. at 19. Conceivably, the subjective component might be lowered when it comes to the medical needs of a pretrial detainee. See Lewis, 523 U.S. at 849-50. However, it does not appear that the objective component would be lowered for pretrial detainees; they would still need to demonstrate the existence of a "serious" medical need. Gaudreault, 923 F.2d at 208 (affirming grant of summary judgment for want of any serious medical need on a claim brought by a pretrial detainee). "A medical need is 'serious' if it is one that has been diagnosed by a physician as mandating treatment, or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Id.

The summary judgment record in this case is not sufficient to generate a trail-worthy issue on the medical needs claim. There is no probative evidence of a serious medical need. Nor, for that matter, is there probative evidence of *any* degree of "culpability" on the part of Coggeshall in relation to the treatment afforded to Clarke. Clarke was not taking antiviral medication when he entered the jail and his lab tests and other circumstances indicated that he did not have a medical need that mandated treatment. As for Clarke's hypoglycemia, the record reflects that Coggeshall appropriately addressed Clarke's dietary requirements and that Clarke's April 4, 2003, episode was brought on by voluntary fasting and not by any indifference or even negligence on the part of jail personnel. Finally, with respect to Clarke's request for the anti-psychotic medication Seroquel, the record is inadequate to support a finding that Clarke suffered

from a psychotic condition that would necessitate such medication or that Coggeshall's refusal to arrange for such medication arose from indifference toward Clarke's medical condition. Coggeshall did see to it that Clarke was medicated for his emotional issues and a factfinder would have to engage in rank speculation in order to find that Clarke required a more powerful, anti-psychotic drug.  Because the record is incapable of supporting a finding that Clarke had an objectively serious medical need or that Coggeshall's treatment of Clarke arose from any culpable state of mind, I recommend that the Court grant Coggeshall's motion for summary judgment on the medical needs claim as well as the other defendants' request for summary judgment on any such claim.

**B.     The State Law Claims**

In addition to the federal claims, Clarke's amended complaint asserts claims of "assault and battery, medical malpractice, negligence and breach of duty." (Docket No. 20, ¶ 2.)  These claims are all subject to the Maine Tort Claims Act (MTCA), 14 M.R.S.A. §§ 8101-8118, because the defendants, as county jail personnel, were performing discretionary functions in service to a Maine governmental entity.  Id. § 8111; Estate of Hampton v. Androscoggin County, 245 F. Supp. 2d 150, 161 (D. Me. 2002); Ellis v. Meade, 887 F. Supp. 324 (D. Me. 1995); Roberts v. Maine, 1999 ME 89, ¶ 10, 731 A.2d 855, 857-58 (citing Erskine v. Comm'r of Corr., 682 A.2d at 681, 686 (Me. 1996) ("[T]he management and care of prisoners is a discretionary function.")); see also Taylor v. Herst, 537 A.2d 1163, 1165 (Me. 1988) (holding that the MTCA's broad definition of governmental employee extends to private medical contractors acting on behalf of a governmental entity to perform a function "central to effecting the State's important responsibilities," and quoting Darling v. Augusta Mental Health Inst., 535 A.2d 421, 428 (1987)).  The defendants all argue that they are absolutely immune from civil liability pursuant to

16

section 8111 of the MTCA. (Knox County Defs.' Mot. Summ. J. at 17-19; Coggeshall's Mot. Summ. J. at 8-9.) Clarke fails to respond to this aspect of the defendants' motions and the record is devoid of any genuine issue of material fact that might call into question the appropriateness of applying the discretionary function immunity that is clearly available to the defendants based on the summary judgment record they have presented. Accordingly, I recommend that the Court grant summary judgment to the defendants on the state law claims.

## Conclusion

For the reasons set forth above, I RECOMMEND that the Court GRANT the defendants' motions for summary judgment (Docket Nos. 64 & 66.)

## NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, within ten (10) days of being served with a copy thereof. A responsive memorandum shall be filed within ten (10) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

Dated December 12, 2006